IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Senior Judge Wiley Y. Daniel**

Civil Action No.  11-cv-02749-WYD-KLM

KIMBERLY ADAIR,

      Plaintiff,

v.

EL PUEBLO BOYS & GIRLS RANCH, INC. LONG TERM DISABILITY PLAN (a/k/a "Your Group Employee Benefits Plan"; a/k/a Plan Number G204821/00001; also left specifically unnamed in an Addendum To Summary Plan Description),

      Defendant.

---

**ORDER**

---

I.   <u>INTRODUCTION</u>

THIS MATTER is before the Court in connection with Plaintiff Kimberly Adair's action for Long Term Disability ["LTD"] benefits under the Employee Retirement Income Security Act ["ERISA"].  Kimberly Adair ["Plaintiff"] asserts that she has remained continuously disabled under the terms of the applicable Plan, which includes a contract of insurance, from October 1, 2002 to the present and is entitled to monthly benefits in the amount of $2,272.50 from January 1, 2003 forward.  Defendant El Pueblo Boys & Girls Ranch, Inc. Long Term Disability Plan ["the Plan"] has failed to pay those benefits from December 30, 2005.

In the previous suit filed by Plaintiff against the Plan, Civil Action No. 06-cv-01343, I found by Order of March 20, 2008, that the denial of LTD benefits to Plaintiff "did not take into account or make adequate findings as to all of Plaintiff's impairments

and whether these impairments impacted her ability to work." (March 20, 2008 Order at

36, ECF No. 84 in 06-cv-01343 [hereinafter "Order of Remand"]).  Accordingly, I

remanded the case for further fact finding and dismissed the case without prejudice.

(*Id.*)  On June 2, 2010, Plaintiff moved to reopen that case and requested that the Court

award further benefits.  I denied that motion on October 29, 2010, finding that any

alleged errors while the case was on remand could be brought to the Court's attention

through a new lawsuit.

Plaintiff commenced the current action on October 21, 2011.  By Order of

January 24, 2013, I denied the Plan's Motion for Summary Judgment which sought

judgment as a matter of law because Plaintiff failed to exhaust her administrative

remedies.  (ECF No. 33.)  I found that Plaintiff is deemed to have exhausted her

administrative remedies pursuant to 29 C.F.R. § 2560.503-1(l).  (*Id.* at 12.)

Plaintiff contends in this action that after assuming the role of claim reviewer

without any apparent authority to do so, AIG Employee Benefit Solutions' Disability

Claims Center ["AIG"][1] (1) failed to review the evidence and make even a partial

determination of her claim until October 15, 2008; (2) ignored findings by its own

employees that Plaintiff was disabled; (3) made only a partial determination of Plaintiff's

right to benefits in October of 2008, despite having all of the documents necessary to

decide the entire claim; (4) did not issue a check for the partial benefits awarded in

October until December of 2008; (5) conducted no further analysis of Plaintiff's claim

---

[1]  The Plan asserts that its insurer, United States Life Insurance Company, is an American
General Company.  Plaintiff's claim after remand was handled by AIG.  While the Plan refers to it as
American General, I will refer to it herein as AIG.

until a full year later, in October of 2009; (6) failed to issue a final decision until

December 29, 2009, and did not issue a check for benefits which accrued between

December 30, 2004 and December 29, 2005 until December 29, 2009; and (7) issued a

final denial of Plaintiff's claim for benefits accruing after December 30, 2005, based

solely on an analysis of total disability when the Plan also pays benefits for partial

disability, for which Plaintiff remains qualified.  Plaintiff also asserts that the Plan itself

failed to take any action at all on her claim despite the Court Order requiring it to do so.

Plaintiff seeks the benefits due under the Plan; an order directing the Plan to (i)

issue a lump sum payment for back payments from December 30, 2005 to present, plus

interest, and (ii) to make monthly benefit payments for as long as Plaintiff remains

disabled; and to enjoin the Plan from any future violations of 29 U.S.C. § 2560.503-1.  A

hearing was held on June 7, 2013, and the matter was taken under advisement.

II.   FACTS

On June 19, 2008, 90 days after this Court issued its Judgment in the previous

action, AIG sent a letter to Plaintiff's counsel at an address which Plaintiff asserts AIG

knew was five years out of date.  (EPR0727).[2]  The letter stated that AIG lacked the

necessary information concerning Plaintiff's functional ability to return to work at the

Sedentary Strength Level, and requested medical information from October 2003

through December 2004 so that AIG could "complete our review of this claim."  (*Id.*)[3]

---

[2]  This is a citation to the administrative record, which was submitted in March 2012 and contains documents EPR0001-777.  I will refer to the record by document number.

[3]  Plaintiff asserts that it appears from this letter that AIG's strategy from the beginning of the remand review process was to limit its review of Plaintiff's claim to the years 2002-2004, as it only requested medical information for that period.  I do not necessarily agree with Plaintiff's interpretation of this letter, but note it for the record.

Plaintiff's counsel states that he did not receive the letter until after he called to inquire why he had not yet heard from the Plan and, in response, AIG faxed the letter to him on June 27, 2008.  Although Plaintiff asserts that AIG is neither the Plan administrator nor the insurance company which insures the Plan, nor is it even the third-party claim review company which conducted the initial review of the Plan, Plaintiff complied with its requests for information.

Plaintiff also asserts that as a result of the previous action and the claim review process occurring as a result of that action, the Plan administrator already had most of the relevant records through February 2004.  According to Plaintiff, her original entitlement to benefits arose on December 30, 2003, and she had supplied the administrator with medical records to support her claim for disability through a psychiatric evaluation report dated February 20, 2004, before the original action was filed in this Court.  Therefore, Plaintiff contends that the Plan administrator could have reviewed Plaintiff's entitlement to benefits through at least February 2004 without any further documents.

In any event, and since four additional years had passed for which Plaintiff claimed benefits, there were additional records which were relevant to her claim.  Upon receipt of AIG's letter in June 2008, Plaintiff's counsel informed AIG that Plaintiff had an appointment with a treating physician on July 22, 2008, and that she would request the records AIG requested at that time.  (EPR0728.)  Plaintiff requested the records as represented, and on August 7, 2008, Plaintiff's counsel provided AIG with a CD containing all of Plaintiff's updated medical records through July 22, 2008.  (EPR0622-

23.)  This included almost 100 pages of up-to-date records from 2003 through July

2008, including the psychiatric evaluation from February 2004.  (EPR0627-0725.)

     In August 2008, AIG undertook its reevaluation of Plaintiff's claim pursuant to the

remand order.  (EPR0002.)  On August 19, 2008, AIG acknowledged the receipt of the

records from Plaintiff's counsel and requested 30 days, up to September 19, 2008, to

complete its review.  (EPR0617.)  AIG's letter stated that "if for some reason additional

time is required to complete our review, we will notify you in writing and will state the

reason(s) for the extension."  (*Id.*)

     On September 15, 2008, although it had already acknowledged receiving the CD

containing Plaintiff's records, AIG sent another letter to Plaintiff's counsel.  It stated in

the letter that "we have made several attempts to obtain a copy of Ms. Adair's

psychiatric evaluation report, dated March 29, 2004," and requested an additional 30

days to review the claim, up to October 15, 2008.  (EPR0594.)[4]

     Plaintiff's counsel responded the same day, September 15, 2008, with a return

fax including a copy of the psychiatric report from February 2004.  (EPR0587–0592.)

Counsel stated in the letter that he was "surprised" that AIG did not have a copy of the

report because "AIG's attorneys were provided with a copy of this document, and many

others, as part of the lawsuit in U.S. District Court", and "they should have provided you

with a copy because AIG is deemed to possess any documents its attorneys possess."

(EPR0587.)  Plaintiff notes that the psychiatric report was also sent to Disability RMS

["DRMS"] in 2004, who had performed the first evaluation of Plaintiff's disability claim,

---

    [4]  It appears that AIG was confused about the date of the psychiatric evaluation, since the only
evaluation in the record from 2004 is dated February 20, 2004.

and had also been disclosed to the Plan during the original litigation.  Indeed, AIG's own internal notes from September 2, 2008, document that the psychiatric evaluation had been sent to DRMS as part of the original appeal.  (EPR0003.)  Further, Plaintiff notes that the Court's Order of March 20, 2008 documented that a psychiatric evaluation was provided to DRMS on March 24, 2004, and informed the Plan that this evidence should be considered on remand.  (Order of Remand at 45.)

AIG's internal notes state that on October 9, 2008, it digitally processed medical records for the following dates:  03/24/2004, 08/16/2008, 06/19/2008, 12/13/2006, 07/24/2007, and 07/22/2008.  (EPR0004-0005.)  Plaintiff asserts that AIG's internal fax scan orders show that the records which are stamped on the bottom as having been "[r]eceived on 8/26/2009 . . ." were actually received by AIG through the CDs provided by Plaintiff's counsel on August 7, 2008 and September 15, 2008.  (EPR0077, 0086.)

On October 15, 2008, AIG notified Plaintiff that she was awarded disability benefits "as the claim file supports the inability to perform her job as a Human Resources Director from October 1, 2002 through the elimination period up to August 20, 2004."  (EPR0222.)  AIG stated in its letter that "[a]s a result of the decision to overturn the appeal, Long-Term Disability Benefits will be paid retroactively from the effective date of Long-Term Disability, December 30, 2002 through August 20, 2004." (*Id.*)  AIG also stated that "[i]n order for LTD benefits to continue beyond August 20, 2004, Ms. Adair must provide additional medical documentation from February 20, 2004 through the present."  (EPR0222-0223.)  Plaintiff asserts in response that not only did AIG already have these medical records in its possession, they had been scanned into its computer system and should have been available for the claim analyst to review.

On October 17, 2008, Plaintiff's counsel responded to AIG's October 15, 2008 letter, stating that he was "uncertain why AIG did not award benefits beyond August 20, 2004, and that Plaintiff "has remained continuously disabled under the terms of the Plan until the present day."  (EPR0216.)  Counsel also stated that Plaintiff was in the process of getting all additional records which existed in response to AIG's assertion that it lacked sufficient documentation of disability, but pointed out that AIG's "letter does not identify what information AIG is lacking in its current file and what, if any, information in the file indicates that Ms. Adair's qualifications for disability benefits changed on August 20, 2004."  (*Id.*)  Counsel asked in the letter that AIG "respond as quickly as possible", as he needed "to know why AIG believes her disability may have ended on August 20, 2004 in order to demonstrate that AIG is incorrect in this belief."  (*Id.*)  Plaintiff asserts that, in fact, AIG was not missing any relevant documents.

On October 23, 2008, AIG sent another fax to Plaintiff's counsel, the cover sheet of which stated that "attached is Ms. Adair's Approval Letter for Long-Term Disability benefits.  Since you are representing her during the appeal process, this letter has been faxed to you for your review."  (EPR0196-99.)  Unlike its previous letter, this letter did not limit the approval date of benefits to August 20, 2004.  (*Id*). Instead, it stated:

> This letter is to inform you of the recent approval of Long-Term Disability benefits based on a complete review of your claim. We have determined you meet the definition of disability as defined in the Group Disability Policy.
>
> Date of Disability: October 01, 2002
> Elimination Period: 90 Days
> Disability Benefit Start Date: 12/30/2002

(EPR0197.)

On November 25, 2008, AIG responded by letter to counsel for Plaintiff's letter of

October 17, 2008.  (EPR0157-158.)  AIG stated therein that Plaintiff's benefits were

extended to December 29, 2004, and that additional forms and records were required

for any extension of benefits beyond that date.  (*Id.*)  It also stated that the definition of

"Total Disability" changes on December 29, 2005, at which time "the medical

documentation to be provided must support the inability to perform the material duties of

any gainful job for which Ms. Adair is reasonably fit by training, education or

experience."  (*Id.*)  Finally, the letter stated that AIG's "intent was to approve benefits for

approximately 5 to 6 months from the date of the last medical on file", and that "[o]ur

records show that we have not received medical documentation beyond the date of the

Psychiatric Evaluation Report, March 29, 2004."  (*Id.*)[5]

AIG did not issue a check for back benefits until December 2, 2008.  AIG paid

Plaintiff $79,448.16 in disability benefits and interest thereon from December 30, 2002

through December 29, 2004.  (EPR0155-56.)  Plaintiff asserts that the payment was

limited in its time period despite the unlimited approval of benefits in the October 23,

2008 letter, stating "you meet the definition of disability."

On December 3, 2008, the day after the check was issued, AIG sent an identical

letter to the one sent on November 25, 2008, again stating it was in response to

Plaintiff's counsel's letter of October 17, 2008.  (EPR0153-54.)  It also stated again that

---

[5]  Plaintiff asserts that the last statement in the November 25 letter was a misrepresentation.  The records her counsel provided AIG on August 7, 2008, included all of Plaintiff's updated records including: Dr. Sunku's records through June 19, 2008; Dr. Ramos' records through July 22, 2008; Dr. Saathoff's records through the end of his treatment on December 13, 2006; and Dr. Juetersonke's records through July 24, 2007.  (EPR0627-725.)

"[o]ur records show that we have not received medical documentation beyond the date of the Psychiatric Evaluation Report, March 29, 2004." (*Id.*)

Plaintiff asserts that, making every effort to cooperate, her counsel provided AIG with even more documentation.  On December 15, 2008, her counsel sent AIG a letter informing it that Plaintiff was seeing Dr. Ramos that day, that she would get a copy of his updated records, that it had been impossible to get a copy of his records until she saw him, and that counsel would send AIG a copy of the records.  (EPR0152.)

On December 17, 2008, Plaintiff's counsel faxed AIG a letter from Dr. Ramos dated December 15, 2008, updated medical records from Dr. Ramos dated July 22, 2008, and the forms that AIG had requested be filled out and signed by Plaintiff.  (EPR0140-51.)  Dr. Ramos' December 15, 2008 letter stated as follows:

> I have treated Kim Adair from before she had to stop working at El Pueblo Boys and Girls Ranch through the present.  During that time, Ms. Adair has remained totally disabled from all full-time work.  Ms. Adair suffers from Fibromyalgia, anxiety, and Depression.  I have been treating both of these conditions since 2004.
>
> Based on my clinical observations and other testing, the combination of these two conditions caused Ms. Adair to experience physical pain, migraine headaches, memory changes, and fatigue on an ongoing basis.  On 7-22-08, I stated that it was okay form [sic] Ms. Adair to work part time, meaning no more than 25 hours per week. Her conditions continue to makes [sic] it impossible for her to work more than 25 hours per week on a consistent basis.  Ms. Adair has not been able to work full time since she left El Pueblo Boys and Girls Ranch.

(EPR0142.)  Dr. Ramos had previously expressed an opinion in 2003 that Plaintiff was "completely disabled from all full-time work since September 30, 2002." (EPR0358-0359.)  He also noted in that letter that "Fibromyalgia patients range from fully functioning to totally disabled and their functioning level can change over time." (*Id.*)

Plaintiff asserts that the Plan contemplates that some employees will be disabled under the terms of the Plan, but still able to do some work.  (EPR0515.)  She further asserts that the Plan encourages beneficiaries to work as much as possible by not reducing disability benefits by amounts earned doing part-time work until the amount earned plus the monthly disability benefit total more than the employee's previous monthly earnings.  (EPR0518.)

Plaintiff notes that in 2004, she had no income.  (EPR0124.)  In 2005, Plaintiff earned $150.00 from Colorado City Metro District and $2,525.35 from Pueblo School District Number 70.  (EPR0125.)  In 2006, Plaintiff earned $1,315.93 from Working Solutions, $50.00 from Colorado City Metro District, and $3,224.76 from Pueblo School District Number 70.  (EPR0126.)  In 2007, Plaintiff earned $4,181.05 from Pueblo School District Number 70 and $2,939.48 from Working Solutions.  (EPR0127.).  Plaintiff points out that even with Dr. Ramos' approval of part-time work in 2008, she was only able to earn $8,988.24 from Pueblo School District Number 70 and $2,785.67 from Working Solutions.  (EPR0128.)

On March 11, 2009, AIG sent a letter acknowledging receipt of the forms it had asked for as well as office notes from Dr. Ramos dated 7/22/08 and 12/15/08, but stated that it was "still awaiting additional medical records from December 30, 2004 through the present."  (EPR0133.)  While it noted Dr. Ramos' statement that, "based on  his clinical observation and other testing, the combination of Ms. Adair's medical conditions caused her to experience physical pain, migraine headaches, memory changes, and fatigue on an ongoing basis", it stated that "Dr. Ramos' office notes are limited in terms [of] outlining Ms. Adair's functional capability."  (*Id.*)  AIG's letter also requested

-10-

Plaintiff's pay records for the part-time work she was able to do.  (*Id.*)  Again, Plaintiff asserts that AIG's statement that it was still waiting for the additional medical records was a misrepresentation, as they had been provided.

On March 20, 2009, Plaintiff's counsel attempted to fax AIG the pay records it had requested.  (EPR0123.)  Plaintiff asserts that it now appears that this fax may not have gone through due to repeated busy signals from AIG's fax machine.

On April 13, 2009, AIG sent another letter stating that it was still awaiting medical records from Plaintiff's "treating physician(s), specifically, Dr. Ramos, for the period of December 30, 2004 through the present."  (EPR0121.)  Again, Plaintiff asserts that this was a misrepresentation, as AIG had been provided these records.

On April 14, 2009, Plaintiff's counsel sent AIG a letter with a CD containing records.  The letter stated, "I am in receipt of your April 13, 2009 letter.  I am including a disk which includes the documents I have today. You should already have everything on this disk, with the exception of some proof of mailing scans, etc."  (EPR0115.)  Copies of the pay records were enclosed which counsel had attempted to fax in March 2009.

On October 3, 2009, Dr. Corey Fox, a board certified clinical health psychologist who was retained by AIG, issued an evaluation of Plaintiff's psychological history.  (EPR0072-76.)  Dr. Fox did not examine Plaintiff, but noted the records he reviewed and his discussion of Plaintiff's condition with her treating physician, Dr. Ramos, on September 28, 2009.  (EPR0073.)  According to Dr. Fox, Dr. Ramos stated that he had last seen Plaintiff in June 2009, and Plaintiff was "doing well." (*Id.*)  "There were no psychological or psychiatric complaints including any cognitive deficits." (*Id.*)  Dr. Fox stated that Dr. Ramos could offer no rationale "for the specification of limiting the patient

to 25 hours/week of work." (EPR0073.)  Dr. Ramos also purportedly "inferred that. . . he

was not able to connect the impression of fibromyalgia with any specific dysfunction or

disability." (*Id.*)  Dr. Fox stated that, "[d]espite numerous reports in the record, neither

Dr. Ramos nor Dr. Saathoff has quantified the relationship of this subjective report to

specific functional deficits or limitations." (EPR0074.)

Dr. Fox discussed Dr. Saathoff's diagnoses of post-traumatic stress disorder

["PTSD"] and depression in the psychiatric evaluation of February 2004.  (EPR0706-

0709.)  Dr. Fox found that the PTSD diagnosis was not clinically supported, and that

"[e]vidence for depression was equivocal; and there was no formal behavior analysis."

(EPR0074.)  Accordingly, he stated that "there was no basis for ascribing disability to

any complaints associated with the psychiatric diagnosis." (*Id.*)  Dr. Fox also found that

"there has been no evidence of inability to work part-time or full-time, based on

psychological problems or psychiatric diagnosis" and that "[t]here is no evidence of

disability associated with the diagnosis of depression or PTSD." (EPR0074-0075.)

Dr. Fox then turned to Plaintiff's "complaints of widespread pain" which he noted

were not challenged" but "the etiology of the complaints remain unclear." (EPR0074).

He also noted that Plaintiff's objective examinations yielded normal results.  (EPR0072.)

He then appeared to discount fibromyalgia as a basis for disability stating, "Extensive

scientific literature has failed to demonstrate any underlying pathology associated with

the diagnosis of fibromyalgia". (*Id.*)  "Disability associated with fibromyalgia has not

been demonstrated; . . .recognized clinical guidelines note that 'full normal activities' are

expected for persons who carry this diagnosis." (*Id.*)  "There is no evidence of disability

which can be logically attributed to the diagnosis of fibromyalgia", and:

> This is a controversial diagnosis.  Most patients who carry this diagnosis continue working.  Why someone so diagnosed claims an inability to work is unclear.  It has not been established that this controversial diagnosis, as an antecedent, is responsible for an inability to work or work full-time for this patient.

(EPR0075.)

Dr. Fox concluded that "there is no evidence of conditions and/or dysfunctions manifested by the claimant from 12/29/04 to the present, which would have prevented her from engaging in the work of 'any occupation.'"  (EPR0075.)  "Similarly, there was no evidence of behavioral or functional limitations from the diagnosed fibromyalgia."

(*Id.*)  He then stated:

> This does not question the validity of the pain related and other subjective complaints voiced by the claimant.  However, such complaints and the relationship to any compromise in activities of daily living have not been demonstrated by the clinical assessments and diagnoses offered in the interval.

(*Id.*)  Accordingly, Dr. Fox found that "there would be no restrictions to the claimant continuing to engage in the part-time work she is performing at present; and there is no limitation to increasing this to full-time work."  (*Id.*)

In so finding, Dr. Fox discounted Plaintiff's complaints of fatigue as "unrelated to the claim of disability for the period 12/29/04 to present", as well as the FCE of September 25, 2003 that showed "some performance deficits."  (EPR0074.)  He stated that "[f]ibromyalgia patients tend to self-limit performance on FCEs; and there is no scientific evidence that such evaluations are reliable and valid for such patients."  (*Id.*)

On October 7, 2009, Dr. Philip Adamo, a medical doctor board certified in internal and occupational medicine, wrote a report based on his evaluation of Plaintiff's records and purported telephone conversation with Dr. Ramos.  (EPR0061-0068.)  He reviewed

Plaintiff's medical records from multiple care providers from 2002 through 2008, the last year for which she provided any records.  As to his conversation with Dr. Ramos, Dr. Adamo stated:

> I introduced myself to Dr. Ramos and explained the purpose of the discussion was to get a better understanding of his patient's clinical status and functional ability.  I asked when Ms. Adair was last seen in the office.  He reported that she had an office visit on 6/19/09.  He stated that she was "OK." She had complaints about her fibromyalgia. There were not complaints about her part time work. . . . In 12/08 she was seen for fibromyalgia and had "vague stuff."   We discussed Ms. Adair's ability to work on a full time basis.  He responded, "It is up to her.  Who really knows what somebody can do."  He stated that he could not give a recommendation one way or another.  If the insurer wants to know what she can do a functional capacity evaluation should be done.  He did state that there are no objective findings to recommend that she be out of work.

(ERP0065-0066.)

Dr. Adamo noted that Plaintiff "has not had regular follow up visits with the rheumatologist [Dr. Timms] since 4/2003." (EPR0066.)  He further noted that "[a]lthough she had a gap in office visits with the neurologist, Dr. Sunku from 1/23/03 until 4/29/08 when she complained of problems with memory, she canceled neuropsychometric testing because she was better." (*Id.*)  "Office notes from Dr Ramos from 9/10/04 to 4/21/08 describe a normal exam with no observable findings documented." (*Id.*)  It was also noted by Dr. Adamo that "[i]n the peer to peer review Dr. Ramos stated that current visits did not have any observable findings."  (EPR0066-0067. )  "There are no medical records that describes any physical difficulty with tasks at part time hours of work." (*Id.*)

Dr. Adamo concluded:

> Based on the medical evidence contained in the file provided, Ms. Adair can work on a full time basis from a physical standpoint.  After 12/9/04, the

medical records no longer describe sleep disturbance, chronic headaches or tender points as was originally described by Dr. Timms, the rheumatologist.  She has not had any ongoing medical evaluations with Dr. Timms or the neurologist, Dr. Sunku.  The office visits with Dr. Ramos are described as "vague" and focus on other physical complaints that do not cause impairment.  When she returned to Dr. Sunku on 4/29/08 she had memory problems.  Although Dr. Sunku recommended neuropsychiatric testing, Ms. Adair declined in 6/08 stating that her memory was better and she thought it was due to stress.

(EPR0067-0068.)  Accordingly, he found that Plaintiff was capable of working eight hours per day, forty hours per week, performing sedentary to light duty tasks.  (*Id.*)  He also found that Plaintiff "has not had ongoing medical evaluations or changes in her medications since 12/29/04.  She does not require any restrictions or limitations."  (*Id.*)

On October 29, 2009, Dr. Saathoff wrote a letter in response to Dr. Fox's evaluation, stating that Dr. Fox was incorrect in finding that Plaintiff does not meet recognized criteria for the diagnosis of PTSD.  (EPR0049.)  Dr. Saathoff discussed the basis for his diagnosis and noted that "[a]ll of these symptoms are detailed in my psychiatric evaluation of 2/20/04."  (*Id.*)  He also stated that Plaintiff was no longer a patient of his, that he last saw her in October 2006, and that while he could discuss her previous diagnoses, he could not comment on Plaintiff's current functioning.  (*Id.*)

On December 3, 2009, Karen Buckley issued an Employability Assessment/ Occupational Review regarding Plaintiff's status.  (EPR0035-41).  She did not conduct her own assessment of Plaintiff, but relied on the medical records given her.  It appears that the only medical reports she was given were that of Dr. Adamo and Dr. Fox as well as the October 29, 2009 letter from Dr. Saathoff wherein he disagreed with Dr. Fox's assessment of PTSD.  (EPR0037-0038.)  Ms. Buckley's report did not reference Dr. Ramos' December 2008 letter finding Plaintiff could not work more than 25 hours

per week or any other records.  As a result of Drs. Adamo and Fox's reports, it appears

that Ms. Buckley was informed only that Plaintiff could work full time at sedentary and

light work without any restrictions.  (*Id.*)  Accordingly, she considered light and

sedentary jobs and concluded that Plaintiff had the capacity to perform full time the job

from which she had become disabled, her current job, and multiple other jobs that would

pay more than Plaintiff was receiving in disability benefits.  (EPR0039-41.)

     AIG did not issue any further written communication to either Plaintiff or her

counsel between its April 14, 2009 letter and its December 29, 2009 letter discussed

below.  (EPR0115 & EPR0019.)

     On December 29, 2009, AIG notified Plaintiff by letter that her benefits were

extended to December 29, 2005, and terminated effective December 30, 2005.  (EPR

0019-28.)  AIG paid Plaintiff an additional $35,459.57 in disability benefits for December

30, 2004 through December 29, 2005.  (EPR0019.)  AIG's letter stated:

> As Kimberly Adair's legal representative, we are notifying you that we
> have completed our review and assessment to establish whether or not
> Ms. Adair meets the definition of the inability to perform the material duties
> of any gainful employment. Our analysis of the information submitted for
> review indicates that no additional benefits are payable beyond the ("any
> gainful job") period of December 30, 2005. . . .Please be advised effective
> December 30, 2005 benefits are terminated.  Our decision to terminate
> benefits is based upon the policy provisions for any gainful job, medical
> evidence submitted, independent reviews and a vocational assessment as
> outlined below.

(EPR0019.)

     As to the medical evidence relied on, the letter refers to the reports of

independent examiners Drs. Fox and Adamo.  (EPR0024.)  It also recounts the

purported telephone conversation Dr. Adamo had with Dr. Ramos (*id.*), but does not

discuss Dr. Ramos' December 2008 letter stating that Plaintiff can only work up to 25 hours a week.  Finally, while the letter does reference Dr. Saathoff's letter of October 29, 2009, noting that he did not agree with Dr. Adamo's assessment regarding PTSD not being clinically viable, AIG appears to discount this because:

> his last office visit with Ms. Adair was on October 2006, and the details of her situational work related PTSD was detailed in his evaluation dated February 2004.  Dr. Saathoff was not able to comment on Ms. Adair's current level of functioning, or provide any additional information regarding Ms. Adair's psychiatric assessment since of [sic] October 2006.  Again, his records note Ms. Adair returned to work part time in 2006. This information supports Ms. Adair was no longer under Psychiatric care, and her ability to work part time with an undetermined date supports the termination of benefits as of December 30, 2005.

(EPR0022.)

Plaintiff asserts that the letter of December 29, 2009, indicates that AIG did not even begin its analysis of her claim until October 1, 2009, when it first began calling Plaintiff's treating physicians, and did not conduct any employability assessment until December 3, 2009.  Further, Plaintiff states that when AIG finally reached its decision on December 29, 2009, it sent both the letter and the check to her counsel at the same out-of-date address used in its June 19, 2008 letter that first requested additional documents after the remand.  This is despite the fact that all AIG letters sent to Plaintiff's counsel between June 19, 2008 and December 29, 2009 had been addressed correctly.  Plaintiff asserts that only the two most significant letters from AIG during the entire review on remand–the letter initiating the review and the letter with the final determination–were mailed to the outdated address where they were unlikely to be forwarded to Plaintiff's counsel.  She further asserts that it was merely luck that her counsel's colleagues at his old address forwarded the final letter and check to him.

Plaintiff did not submit any additional medical, psychological, or employment information to AIG after December 29, 2009.

The final termination letter included a notice that any appeal of the termination decision must be submitted in writing within 180 days of receipt of the notification.  (EPR 0028.)  Plaintiff did not appeal the termination decision.

III.   ANALYSIS

A.   Standard of Review

Both parties agree that I should review AIG's decision to deny Plaintiff LTD disability benefits beyond December 30, 2005 on a de novo basis.  Indeed, as noted in my Order of Remand in Plaintiff's previous case, de novo review applies because "[i]t is undisputed that the Plan did not give discretion to the Administrator."  (Order of Remand at 18.)

In conducting a de novo review, "the court's role is to determine whether the [plan administrator] made a correct decision based upon the administrative record before it when the decision was made."  *Null v. Cmty. Hosp. Ass'n*, 379 F. App'x 704, 705 (10th Cir. 2010); *Pratt v. Petroleum Prod. Mgmt., Inc. Emp. Sav. Plan & Trust*, 920 F.2d 651, 658 (10th Cir. 1990).  The court "'reviews the administrator's decision without deference to that decision and without any presumption of correctness.'"  *Gilbertson v. AlliedSignal, Inc.*, 172 Fed. Appx. 857, 860 (10th Cir. 2006) (quotation omitted).

When interpreting the terms of an ERISA-governed plan under the de novo standard, a Court will "giv[e] the language its common and ordinary meaning *as a reasonable person in the position of the [plan] participant*, not the actual participant, would have understood the words to mean."  *Blair v. Metropolitan Life Ins. Co.*, 974 F.2d

1219, 1221 (10th Cir. 1992).  Federal courts should not "'function as substitute plan administrators.'"  *Jewell v. Life Ins. Co. of N. Am.*, 508 F.3d 1303, 1308 (10th Cir. 2007) (quotation omitted).

      B.    <u>Alleged Procedural Irregularities</u>

I first address procedural arguments made by Plaintiff.  Plaintiff asserts that the Plan Administrator never took any action to comply with the Court's Order of Remand in the previous case, nor did DRMS, which had made the decision to deny benefits, nor did the United States Life Insurance Company ["USL"] in the City of New York which insures the Plan.  Instead, AIG, whose web page publically states that USL, not AIG, is responsible for its own "underwriting risks, financial obligations and support functions associated with the products issued," undertook the review of Plaintiff's claim.

I first reject Plaintiff's argument that AIG's review of Plaintiff's claim, as compared to some other entity, constitutes a ground to vacate the decision.  Plaintiff has not shown any prejudice by the fact that AIG, as compared to some other entity, conducted the investigation and made the benefits decision.  *See Jaremko v. ERISA Admin. Committee*, No. 12-2179, 2013 WL 1896801, at *2 n. 1 (10th Cir. May 8, 2013) (procedural errors unavailing where the claimant did not attempt to show prejudice).

Moreover, as noted in my Order of Remand, under Tenth Circuit law a fiduciary may delegate the performance of certain tasks which it is unreasonable to require it personally to perform.  (Order of Remand at 14-15) (citing *Geddes v. United Staffing Alliance Emp. Med. Plan*, 469 F.3d 919 (10th Cir. 2006)).  As noted in that Order, [i]t is certainly arguable that the Plan Administrator properly exercised its 'inherent' power to delegate the processing and evaluation of disability benefits claims by its employees to

-19-

United States Life, the insurer of the benefits", and USL "in turn—like the benefits provider in *Geddes*— properly retained a claims analysis expert", in this case AIG, "to evaluate whether the individual claimants qualified for benefits".  (Order of Remand at 15).  As further noted in that Order, even if AIG "was not properly delegated the authority to conduct the claim review, this simply means that a denial of plan benefits is reviewed under the de novo standard".  (*Id*.)  Here, I am already reviewing the decision under the de novo standard.

Plaintiff also argues numerous other procedural deficiencies, including the fact that AIG did not begin its review until more 90 days after the Court issued its ruling and it failed to make a final decision on the entire claim for more than a year and a half, until December 29, 2009.  Indeed, AIG did not issue a final determination until 649 days from the date the Court remanded the case for further review.  Further, Plaintiff asserts that AIG's December 29, 2009 letter indicates that AIG did not even begin its analysis of the claim until October 1, 2009, when it first began calling Plaintiff's treating physicians, and did not conduct any employability assessment until December 3, 2009.  Plaintiff also points to the fact that despite AIG's limited initial request for records, on August 7, 2008, her counsel provided it with almost 100 pages of up-to-date records from 2003 through July 2008.  Rather than consider these records, AIG continued to assert and misrepresent that it did not have these records.  (See EPR0222 & EPR0627 –0725.) Finally, Plaintiff asserts that when AIG finally reached its decision on December 29, 2009, it sent both the letter and the check to her counsel's out-of-date address.

I reject these alleged procedural deficiencies as a basis to reverse or remand the decision.  Where there are procedural defects or irregularities, the normal remedy is to

consider reviewing the claim on a de novo basis.  *LaAsmar v. Phelps Dodge Corp. Life, Accidental Death & Dismemberment and Dependent Life Ins. Plan*, 605 F.3d 789, 796 (10th Cir. 2010).  Here, the claim is already being reviewed on such a basis.  Moreover, the procedural irregularities in the case also caused me to find that Plaintiff was deemed to have exhausted her administrative remedies, and to deny Defendant's Motion for Summary Judgment on that issue.  (Order of January 24, 2013, ECF No. 33.)  Most importantly, I find that Plaintiff did not establish prejudice from any of these procedural irregularities.  Her claim was ultimately processed on the merits, and Plaintiff has not shown how the alleged procedural irregularities impacted the denial of her claim for LTD benefits after December of 2005.  *See Jaremko*, 2013 WL 1896801, at *2 n. 1 (requiring that prejudice be shown to prevail on procedural issues).

Finally, Plaintiff points to the fact that AIG's note from October 20, 2008 found that she was disabled but omits the date through which this disability was found. (EPR0005).  Plaintiff asserts that the rest of the recommendation has been deleted, and suggests that AIG erased its own internal findings which appear to recommend a date through which benefits should be approved.  She argues that the Plan has a duty under ERISA to maintain and produce upon request copies of all claim records, especially as it knew that litigation would almost certainly follow its denial of benefits, and that sanctions may be appropriate due to spoliation of evidence.  She also argues that the loss of the evidence prejudiced her, as she has no way to reconstruct the original evidence, and that an appropriate sanction is to hold as a matter of law that AIG's own internal review found she was disabled through the present.

I reject the argument that sanctions are appropriate.  While AIG's note at issue is not filled out in its entirety, I agree with the Plan that the immediately subsequent notes support AIG's assertion that the recommendation was to award Plaintiff benefits through August 2004.  (*See* EPR006, "Approval Recommendation".)  I further find that, at most, the failure to complete the note is a clerical error, and does not constitute spoilation of evidence for which sanctions are appropriate.  Certainly, the mere fact that a recommendation is not filled out as to the date Plaintiff should be found disabled does not warrant the sanction that Plaintiff requests—an inference that AIG found Plaintiff was disabled through the present.

C.    The Merits

I now turn to the merits of Plaintiff's claim.  The issue I must determine is whether AIG correctly decided that Plaintiff is not entitled to LTD benefits after December 2005.  In resolving that issue, I must decide whether AIG correctly decided that Plaintiff did not meet the definition of "TOTAL DISABILITY" after December 29, 2005.  (*See* EPR0157-0158; 0515.)  To be totally disabled after that date, the medical documentation must show Plaintiff's "complete inability to perform the material duties of any gainful job for which [she is] reasonably fit by training, education or experience." (*Id.*)  The claimant must also "be under the regular care of a physician." (*Id.*)

Plaintiff asserts that while AIG decided that she was totally disabled from October 1, 2002 through December 30, 2005, and was entitled to disability benefits from December 30, 2002 through December 29, 2005, it denied benefits beyond December 29, 2005 with no reasonable justification for doing so.  She asserts that she remains disabled under the terms of the Plan.

Plaintiff also argues that AIG erred in denying benefits beyond December 29, 2005 because it focused solely on an analysis of whether she was totally disabled under the Plan, and failed to determine whether she was partially disabled during some or all of that period. In that regard, AIG reviewed and assessed whether Plaintiff met the definition of the inability to perform the material duties of any gainful job, as set forth in the definition of total disability under the Plan. By contrast, the Plan provides that a claimant is partially disabled if she is "not able to perform the material duties of [her] regular job, but [is] able to perform. . . at least one of these duties on a part-time basis, or . . .at least one, but not all, of these duties on a full-time basis." (EPR0515.)[6]

In short, Plaintiff asserts that she is entitled to continuing disability benefits while she remains either totally or partially disabled as defined by the Plan, and the evidence presented to AIG demonstrated that she continues to be partially disabled under the terms of the Plan even today. She contends that her ability to return to part-time work shows that she was able to perform at least one of the material duties of her regular job on a part-time basis, but she remains unable to perform all of those duties on a full-time basis, citing to Dr. Ramos' letter of December 15, 2008. (EPR0142.)

In response, the Plan asserts that Plaintiff was awarded benefits for the first 36 months of her claimed disability, *i.e.*, through December 29, 2005, based on her alleged inability to perform her "regular job" as human resources director for El Pueblo Boys' & Girls' Ranch. (EPR0020.) To remain eligible after that period, Plaintiff was required to demonstrate the "complete inability to perform the material duties of *any* gainful job for

---

[6] The term "regular job" means the job the claimant was performing on the day before disability began. (*Id.*)

-23-

which [she is] reasonably fit by training, education or experience." (*Id.*) (emphasis added).  The Plan argues that she did not meet that definition.

Specifically, the Plan asserts the medical evidence submitted, independent reviews of Drs. Fox and Adamo, and the vocational assessment from Karen Buckley obtained by AIG proved Plaintiff was not disabled after December 29, 2005.  In fact, the Plan asserts that Plaintiff's own doctors' records belie that Plaintiff fits the definition of total disability, starting at some point prior to the end of 2005.  For example, AIG states that Dr. Saathoff noted that Plaintiff was working as a substitute teacher in September 2005 (EPR0687), and Dr. Ramos reported that Plaintiff had been cleared to work up to 25 hours per week as of June 2008.  (EPR0142.)  The Plan also argues that Plaintiff was not under the regular care of a physician as required to be totally disabled.  Finally, it asserts that Plaintiff's brief consists primarily of attempts to deflect the focus of the review from the substance of her claim to complaints about the alleged shortcomings in AIG's procedures.

As to whether Plaintiff met the definition of partial disability, the Plan admitted at the hearing that it did not make this determination.  However, it asserts that it was not required to determine this issue because Plaintiff claimed only that she was totally disabled, and did not seek a determination of whether she was partially disabled.

Turning to my analysis, I first address the issue of whether the Plan, through AIG, correctly decided that Plaintiff did not meet the definition of total disability after December 29, 2005, *i.e.*, whether AIG had sufficient evidence in the record for it to have correctly decided that Plaintiff was not totally disabled after December 30, 2005.  This in turns depends on whether AIG properly relied on the evaluations of its medical experts,

Drs. Fox and Adamo, who did not examine Plaintiff, and on the vocational assessment of Karen Buckley.

In addressing the issue, I acknowledge that "courts have no warrant to require administrators to accord special weight to the opinions of a claimant's physician; nor may courts impose on administrators a discrete burden of explanation when they credit reliable evidence that conflicts with a treating physician's evaluation". *Black & Decker Disability Plan v. Nord,* 538 U.S. 822, 834 (2003).  However, I find errors in the reports of AIG's medical examiners Drs. Fox and Adamo as well as the vocational assessment of Karen Buckley, as discussed below, and find that AIG's evaluation of Plaintiff's claim was insufficient to support its finding that Plaintiff is not entitled to LTD benefits after December 29, 2005.

The first issue I address is whether AIG had sufficient evidence to substantiate its finding that while Plaintiff was totally disabled prior to December 29, 2005, she became able to work full time after that date.  As previously noted, to be totally disabled after December 29, 2005, Plaintiff must have been unable to perform the material duties of "any gainful job" for which she was "reasonably fit by training, education or experience." (EPR0515).  I find insufficient evidence in the record to justify AIG's decision that Plaintiff was able to perform gainful jobs after December 29, 2005.  That is because I find that AIG failed to conduct a proper assessment, as required by my Order of Remand, of the combined impact of Plaintiff's fibromyalgia and psychiatric impairments and how they impact her functional ability to work.

As noted in the Order of Remand, Dr. Ferrante, a consulting rheumatologist, got confirmation from Dr. Timms, Plaintiff's treating rheumatologist, that a functional

capacity evaluation ["FCE"] would be helpful.  (Order of Remand at 29.)  Dr. Timms

clarified that stress may greatly exacerbate fibromyalgia symptoms, and that there were

issues with fatigue, headaches and other deficits that needed to be evaluated.  (*Id.* at

32.)  I found in the Order of Remand that these issues, including psychological issues

related to Plaintiff's fibromyalgia, needed to be properly evaluated.  (*Id.* at 36-38.)

Indeed, I noted that the key issue in the case are the nonphysical requirements of

Plaintiff's work and the extent to which Plaintiff's impairments may impact same.  (*Id.* at

37.)

        I further rejected the Plan's argument that Plaintiff's psychological impairments

are a separate condition, unrelated to fibromyalgia.  (Order of Remand at 36.)  In that

regard, I noted treating physician Dr. Ramos' opinion that Plaintiff had both a Class Five

physical and mental/nervous impairment as a result of her fibromyalgia, and that

Plaintiff's psychiatric problem was related to the stress/depression associated with her

clinical diagnosis of fibromyalgia.  (*Id.* at 37.)  AIG's own case manager recognized this,

stating in notes dated October 20, 2008:

> The symptoms of both Fibromyalgia and depression/anxiety are
> intertwined and difficult to differentiate which is primary and secondary.
> These diagnosis [sic] need to be looked at as a whole, because one will
> affect the other.

(EPR0165.)

        The Order of Remand also noted Dr. Ferrante's opinion that while Plaintiff could

work from a physical capacity, there appeared to be a serious psychiatric condition for

which a psychiatric consultation would be appropriate.  (Order of Remand at 37.)

Dr. Ferrante also "noted that the psychiatric issues appear to be the major roadblock to

working, according to Dr. Ramos, and that there is not enough detail in the record for a specific psychiatric diagnosis." (*Id.*) The Order pointed out that psychiatrist Dr. Elkins confirmed Dr. Ferrante's opinion, stating that "the information in the file does not contain a psychiatric evaluation and therefore it is not possible to render an opinion regarding whether Plaintiff's mental condition precluded her from employment and whether her mental condition was related to her fibromyalgia." (*Id.*) Finally on this issue, the Order of Remand stated that while DRMS, the previous claim administrator, did order a psychiatric evaluation, it ignored Drs. Ferrante's and Elkins' findings that there was not enough in the record for a psychiatric diagnosis to be made and ordered a records evaluation only. Thus, I found that DRMS did not properly evaluate the evidence, and remanded the case for further fact finding.

AIG also chose not to obtain a psychological examination of the Plaintiff, or an examination that addressed the combination of Plaintiff's psychological and physical impairments. AIG also did not obtain a FCE that addressed the issues I remanded as to. This is despite AIG's case manager's finding that it was "reasonable to conclude that the increase in stress at work caused the symptoms of anxiety/depression to manifest and the condition of the asymptomatic fibromyalgia to become symptomatic", even after Plaintiff stopped working and after adjustments to her medication. (EPR0165.) Accordingly, the case manager concluded that Plaintiff's job requirements needed to be analyzed to determine "the challenges involved from a cognitive, critical thinking, analytical requirements" of the job. (EPR0162.)

AIG chose instead to retain Dr. Fox and Dr. Adamo to conduct a records review. Dr. Adamo did not analyze, however, Plaintiff's psychological impairments or how they

related to her fibromyalgia.[7]  While Dr. Fox analyzed both impairments, he assessed

them independently and did not address how the psychological impairments impacted

the fibromyalgia.  Unlike DRMS, however, Dr. Fox was provided and reviewed a copy of

Plaintiff's 2004 psychiatric evaluation by Dr. Saathoff (EPR0555-0558).  Dr. Saathoff

found that the psychiatric problems were complicated by Plaintiff's physical complaints

which he noted "seemed quite disabling", even though he found that the psychiatric

complaints may in and of themselves be disabling.  (EPR0557.)[8]  However, the report

did not actually evaluate the combined impact of Plaintiff's psychological impairments

and fibromyalgia and how they impacted her to work.  It also did not address the impact

of stress, fatigue, and headaches on Plaintiff's ability to work.

Dr. Fox recognized that the record was devoid of a comprehensive psychological

evaluation, stating, "there has been no psychological evaluation, with appropriate

diagnostic psychometric testing, to establish the validity of the complaints and the

degree of association with any reported dysfunction." (EPR0074.)  Without such

testing, he noted that Dr. Saathoff's citation to a GAF score was meaningless.  (*Id.*)  Dr.

Fox further noted:

there were premorbid interpersonal problems in the workplace shortly
preceding the complaints upon which the impressions of fibromyalgia and

---

[7]  He stated that "[t]he psychiatric diagnoses are beyond the scope of my expertise and therefore I
cannot comment on her functional ability from a psychiatric standpoint."  (EPR0067.)

[8]  Dr. Saathoff gave Plaintiff a GAF score of 50, which indicates "'[s]erious symptoms (e.g.,
suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social,
occupational, or school functioning (e.g., no friends, unable to keep a job).'"  *Keyes-Zachary v. Astrue*, 695
F.3d 1156, 1162 n. 1 (10th Cir. 2012) (quoting American Psychiatric Ass'n, Diagnostic and Statistical
Manual of Mental Disorders 34 (Text Revision 4th ed.2000)).  "The GAF is a 100–point scale divided into
ten numerical ranges, which permits clinicians to assign a single ranged score to a person's psychological,
social, and occupational functioning."  *Id.*

various psychiatric diagnoses were made.  This is very often seen in patients who develop chronic benign pain syndromes.  However, there has been no rigorous analysis of this; it was not addressed in the psychiatric/psychological treatment.

(*Id.*)  Despite these findings, AIG did not order a comprehensive psychological evaluation of Plaintiff.

Dr. Fox also stated that he discussed Plaintiff's impairments with treating physician Dr. Ramos.  This did not, however, address the problem noted in the Order of Remand—that the record was not sufficient to determine whether Plaintiff's mental impairments combined with or associated with her fibromyalgia impacted her ability to work.  Indeed, Dr. Ramos told AIG's expert Dr. Adamo that if the insurer wanted to know how her impairments impacted her work, it needed to obtain a FCE.

Thus, while AIG obtained the reports of Drs. Adamo and Fox finding that Plaintiff could work full time, they were deficient because the record was insufficient for them to make an informed determination as to the impact of Plaintiff's combination of impairments.  Similarly, their reliance on the fact that neither Dr. Ramos nor Dr. Saathoff had supported the diagnoses of fibromyalgia and psychological impairments with any specific functional deficits or limitations was improper, as the Plan did not comply with the requirement to conduct a proper evaluation of Plaintiff's impairments as a whole and how they impacted her ability to work.

Further, Dr. Fox and Dr. Adamo's reports did not distinguish between Plaintiff's impairments before December 29, 2005, when Plaintiff was found to be totally disabled, and after December 30, 2005.  Instead, they appeared to find that Plaintiff's impairments were not disabling at any time, contrary to AIG's findings in the case.  AIG

did not explain why it chose to rely on their reports only as to the time period after December 29, 2005.

Thus, neither Dr. Fox nor Dr. Adamo explained how, even though AIG had found that Plaintiff's combined impairments caused her so much stress that she was totally disabled from working at her regular job as human resources director prior to December 30, 2005, her condition so improved after that date as to allow her to work full time at gainful jobs for which she was reasonably fit by training, education and experience. Indeed, without a comprehensive examination of Plaintiff and evaluation of how her impairments impacted her ability to work, such a determination would have been difficult, if not impossible.  This was recognized by Dr. Ramos when he told Dr. Adamo that it needed to obtain a FCE as to what functional limitations Plaintiff had.  This was also recognized in AIG's own notes that indicate a referral to clinical was needed as to Plaintiff's functional capacity, as the case manager was unable to determine if Plaintiff continued to meet the definition of total disability beyond December 30, 2004 "based on the medical provided thus far and the functional capacity outlined documentation." (EPR0089.)

The Plan appears to contend, however, that stress, headaches, fatigue and other issues I found needed to be properly examined had resolved after 2005.  Indeed, the Plan asserts that while Plaintiff complained of cognitive deficits, she declined to go through with a neuropsychiatric assessment, stating that her problems were probably due to stress.  Also, Dr. Fox discounted without explanation Plaintiff's complaints of fatigue as "unrelated to the claim of disability for the period 12/29/04 to present." (EPR0074.)  Dr. Adamo stated, "[a]fter 12/9/04, the medical records no longer describe

sleep disturbance, chronic headaches or tender points as was originally described by Dr. Timms, the rheumatologist."  (EPR0067.)

However, my review of the records showed continuing problems in the areas I ordered to be addressed.  As noted above, Plaintiff indicated that her problems were probably due to stress, the very issue that AIG's case manager noted caused Plaintiff's impairments to be totally disabling.  (EPR0165.)  Dr. Ramos noted chronic fatigue in his office visit of July 22, 2008, at which time he limited Plaintiff to part time work. (EPR0627.)  Dr. Ramos also noted recurrent headaches in his notes of July 2005 (EPR0642), and a recurrent medical issue in December 2006 that increased after Plaintiff started working part time.  (EPR0637.)  Dr. Sunku's notes from an office visit in June 2008 state that Plaintiff returned "for a recheck regarding her chronic headaches, dizziness, memory problems, and for further recommendations."  EPR0668.)  While Dr. Sunku noted that Plaintiff felt her headaches had "markedly improved", she still reported about three a month.  (*Id.*)  Dr. Sunku diagnosed "Chronic headaches, migraines, doing quite well" and "Memory difficulties, which she believes could be related to her stress."  (EPR0669.)

The Plan also argues, however, that Plaintiff did not meet the definition of total disability after December 29, 2005, because she was not under the regular care of a physician.  I reject this argument, just as I previously rejected it in my Order of Remand. While Plaintiff may not have continued to see some of her doctors, including rheumatologist Dr. Timms, neurologist Dr. Sunku and psychiatrist Dr. Saathoff, she continued to see her primary care physician ["PCP"] Dr. Ramos.  Indeed, according to the report of Dr. Adamo, Dr. Ramos had seen Plaintiff shortly before his report was

-31-

issued in June 2009.  Further, Plaintiff had been seeing Dr. Ramos since at least

January of 2002.  (Order of Remand at 21.)  I also note that while AIG stated in its

denial letter that Plaintiff was "no longer under Psychiatric care" (EPR0022), this fails to

take into account the fact that Dr. Ramos was treating both Plaintiff's conditions, and

prescribing medication for same.  (*See, e.g.*, EPR0073—Dr. Fox's report noting that

current medications prescribed by Dr. Ramos were Lyrica and Cymbalta[9]; EPR0064—

Dr. Adamo's report noting that Plaintiff called Dr. Saathoff "on 12/13/06 to cancel

because she could no longer afford the co-pays" and "[s]he was going to have her PCP

refill the medications").

I also find other problems with both Dr. Fox's and Dr. Adamo's reports.  First,

the record is unclear as to how Dr. Fox, a psychologist, was qualified to provide an

opinion about fibromyalgia, a physical condition normally treated by rheumatologists.

Certainly, he did not explain his qualifications for rendering such an opinion.

Second, both Drs. Adamo and Fox relied on the lack of objective findings in the

record regarding Plaintiff's fibromyalgia.  However, this ignores my Order of Remand

which found DRMS erred by relying on the lack of such findings as a basis to deny

Plaintiff's disability application.  (Order of Remand at 44.)  The Order stated that DRMS'

statements on that issue "indicate a lack of understanding of a diagnosis of fibromyalgia

which is not supportable by law."  (*Id.*)  It further stated:

---

[9]  Lyrica is a medication used, *inter alia*, to treat pain in people with fibromyalgia.
http://www.webmd.com/drugs/drug-93965-Lyrica+Oral.aspx?drugid=93965&drugname=Lyrica+Oral.
Cymbalta is an antidepressant medication used to treat depression and other mental disorders.
http://ww.webmd.com/drugs/drug-91491-Cymbalta+Oral.aspx?drugid=91491&drugname=Cymbalta+Oral.

. . .DRMS failed to consider that objective findings are not necessarily required in connection with such a diagnosis and that there are no clinical tests which support a finding of fibromyalgia or its symptoms. *See Moore v. Barnhart*, 114 Fed. Appx. 983, 991 ("[t]he ALJ recognized plaintiff's diagnosis of fibromyalgia, but seems to require that it be established for a formal clinical or laboratory test. . . . [t]he disease . . . 's diagnosed entirely on the basis of patients' reports and other symptoms'") (quotation omitted); *Glenn v. Apfel*, 102 F. Supp. 2d 1252, 1254-1255, 1258 (D. Kan. 2000) (noting that courts have recognized that the pain suffered by those with fibromyalgia can be disabling, and that "[t]he symptoms of fibromyalgia are entirely subjective, and there are no clinical tests to identify its presence or severity"). . . .

(*Id.*) AIG erred in the same way in relying on Drs. Fox and Adamo's findings on this issue.

I also note that Drs. Fox and Adamo ignored the fact that Plaintiff's treating rheumatologist Dr. Timms made the diagnosis of fibromyalgia based on multiple tender points in a physical exam. (EPR0434; EPR0432, EPR0380.) The Tenth Circuit has stated that "[c]linical signs and symptoms supporting a diagnosis of fibromyalgia" include tender points on the body. *Brown v. Barnhart*, 182 F. App'x 771, 773 n. 1 (10th Cir. 2006). Thus, there were clinical signs that supported the diagnosis of fibromyalgia. Once this diagnosis was properly made, Dr. Ramos' finding that Plaintiff continued to have fibromyalgia was a supported medical finding that could not be discounted. (EPR0067). Also, Dr. Fox's opinion that fibromyalgia is not generally a basis for disability as full normal activities are expected for persons who carry this diagnosis is contrary to Tenth Circuit law, which recognizes that fibromyalgia can be disabling. *See, e.g., Moore v. Barnhart*, 114 F. App'x 983, 991 (10th Cir. 2004).

I further find error with Dr. Fox's opinion that Plaintiff's psychological diagnoses of depression and PTSD were not supported. Treating psychiatrist Dr. Saathoff did a comprehensive Psychiatric Assessment in February 2004 wherein he made these diagnoses and supported them in the report. (EPR0706-0709.) After Dr. Saathoff was

provided a copy of Dr. Fox's report, he wrote a letter specifically disagreeing with Dr. Fox's finding that PTSD was not clinically supported, and documented how it was supported.   Dr. Fox's decision to completely discount that opinion by a treating psychiatrist is problematic, since there was no evidence in the record that contradicted Dr. Saathoff's diagnoses, and AIG had accepted that Plaintiff was disabled through the date of that evaluation.  (EPR0165.)

Another error I find is with Dr. Fox's decision simply to discount the FCE of 2003 which showed "some performance deficits".  He stated that "[f]ibromyalgia patients tend to self-limit performance on FCEs; and there is no scientific evidence that such evaluations are reliable and valid for such patients."  (EPR0074.)  The FCE evaluator, however, found that Plaintiff's efforts were valid.  (EPR0289-0293.)  There is thus no evidence that Plaintiff self-limited her performance, and Dr. Fox's conclusion that fibromyalgia patients in general tend to limit self-performance is merely speculative. There is no indication in the record that Dr. Fox is an expert as to FCEs or how to interpret the results of same, and his conclusion that such evaluations are not reliable and valid for fibromyalgia patients is unsupported.  Indeed, FCEs are routinely ordered and relied on by the insurance industry in determining whether a patient is entitled to LTD benefits, regardless of the disability.

On the other hand, Dr. Adamo relied on the 2003 FCE as well as a surveillance video to support his finding that Plaintiff could work full time.  (EPR0064-0067.) However, his finding ignores my Order of Remand which pointed out that Dr. Ramos had clarified that the FCE and the surveillance video conformed with his earlier diagnosis that Plaintiff's fibromyalgia prevents her from working any full-time job on a

consistent basis, rendering her totally disabled.  (Order of Remand at 43 n. 8.)  As noted

in that Order, Dr. Ramos explained that fibromyalgia does not prevent Plaintiff from

performing the tasks during the FCE.  Instead, he found that she is not capable of

performing those tasks eight hours a day, five days a week on a consistent basis, as is

required for full-time work.  (*Id.*)  The finding by Dr. Adamo regarding the FCE and

surveillance video are also inconsistent with AIG's finding that Plaintiff was totally

disabled up through December 29, 2005.  AIG did not explain why it relied on the report

of Dr. Adamo as to disability after December 29, 2005 but not before.

Finally, I question AIG's apparent decision, without explanation, to completely

discount treating physician Dr. Ramos' written opinions that Plaintiff was unable to work

full time up to July 2008, and after that, unable to work more than 25 hours a week.  AIG

may have made that decision based on Drs. Fox and Adamo's report of hearsay

conversations from a telephone call they purportedly had with Dr. Ramos.  While a plan

administrator can rely on this type of hearsay if it is reasonably reliable, *see Null v.*

*Community Hospital Ass'n*, 379 F. App'x 704, 706 (10th Cir. 2010), I question the

reliableness of the evidence in this case.[10]  More importantly, even if the reports of the

telephone conversations with Dr. Ramos are reliable, there is no indication that

---

[10]  In *Null*, the plan administrator cited as a basis to terminate benefits a reported telephone conversation between its medical director and the claimant's rheumatologist who "purportedly stated that Ms. Null was physically able to return to work."  *Id.*  The Tenth Circuit agreed with the district court that the disability decision could not "be overturned simply because part of the evidence relied upon to reach it may have been based on hearsay."  *Id.*  In so finding, however, it noted that "the written record included an opinion from Dr. Hynd that Ms. Null could return to work as long as she continued taking her medication and observed standing and lifting restrictions."  *Id.*  Unlike in *Null*, Drs. Adamo and Fox's reports of Dr. Ramos' statements in the telephone conversations appear to directly conflict with or at least seriously call into question Dr. Ramos' actual written opinions.  In that context, I find that the reliability of AIG's medical experts' decision to discount Dr. Ramos' written opinions based merely on his reported hearsay statements is suspect.

Dr. Ramos actually retracted his opinions of total disability up to July 2008 or Plaintiff's ability to work only 25 hours a week thereafter.  Further, he expressly told Dr. Adamo that if the insurer wants to know what Plaintiff can do a FCE should be done. Accordingly, I find that AIG erred in relying on Drs. Adamo and Fox's apparent decision to simply discount Dr. Ramos' opinions based on their conversations with him.

AIG also relies on the vocational report of Karen Buckley to justify its decision not to award LTD benefits after December 29, 2005.  I find that report is also deficient as it does not address the issues I required to be addressed in the Order of Remand.  It also is deficient because Ms. Buckley was not provided the conflicting medical information as to whether and to what extent Plaintiff was disabled after December 29, 2005.  As noted in Section II, *supra*, treating physician Dr. Ramos opined that Plaintiff was disabled and unable to work up through July of 2008, at which time she became able to work only 25 hours per week.  Further, as noted by Dr. Fox, a FCE in 2003 found that Plaintiff had "some performance deficits."  (EPR00075.)  Ms. Buckley was not provided with a copy of Dr. Ramos' reports or the FCE.[11]  She was provided only the opinions of Drs. Fox and Adamo opining that Plaintiff was able to work full time at sedentary or light work after December 29, 2005, and which did not address the combined impact of Plaintiff's impairments and the other issues addressed in my Order of Remand.  Without a proper analysis of such issues, Ms. Buckley could not make an informed determination as to

---

[11]  Notably, my Order of Remand stated that the FCE showed restrictions that may impact Plaintiff's ability to work, and directed that it be considered on remand.  (*Id.* at 43.)  The noted restrictions included, among other things, the need for a 15 minute break from a sitting posture ever hour, and restrictions in repetitive fine motor activity.  (EPR0289-0293.)  Also, fatigue was noted to be a limiting factor.  (*Id.*)

how Plaintiff's impairments impacted her ability to perform jobs for which she was reasonably fit by training, education and experience.

Thus, Ms. Buckley did not actually assess Plaintiff's functional capacity or how it was impacted or may have changed after December 29, 2005.  Further, she did not analyze the cognitive, critical thinking and/or analytical requirements of the jobs that she found Plaintiff could do to determine how they compared to Plaintiff's human resources job with El Pueblo Boys' and Girls' Ranch.  This was important as AIG had recognized that these issues needed to be analyzed with regard to her HR job at El Pueblo (EPR0162), and that the stress of that job rendered Plaintiff totally disabled due to the combination of her impairments.  (EPR0165.)  If the stress of Plaintiff's regular job caused her "asymptomatic fibromyalgia" to be symptomatic (*id.*), the same may well be true of other jobs that Ms. Buckley found Plaintiff could do.  This was not properly assessed.

Ms. Buckley also did not determine whether Plaintiff could perform all the duties of full time sedentary or light work or, if Plaintiff can only work up to 25 hours a week as opined by Dr. Ramos, whether the jobs that she found Plaintiff could do could be performed part time.  This was also error.  I note that under Tenth Circuit law, "'the plan administrator has a fiduciary duty to the insured to conduct an investigation and to seek out the information necessary for a fair and accurate assessment of the claim.'"  *Null*, 379 F. App'x at 707 (quoting *Rasenack ex rel. Tribolet v. AIG Life Ins. Co.*, 585 F.3d 1311, 1324 (10th Cir. 2009)).  This includes a duty to "gather[ ] enough evidence to demonstrate that [the claimant] is able to perform other occupations."  *Id.*

Here, not only did Ms. Buckley fail to gather evidence to demonstrate that Plaintiff was actually able to perform other occupations, she also made findings which are inconsistent with AIG's decision to award disability up to December 29, 2005.  While AIG found that Plaintiff was totally disabled up to that date because she was unable to perform the material duties of her job at El Pueblo Boys' and Girls' Ranch, Ms. Buckley found the exact opposite—that Plaintiff was able to perform that job.  Neither Ms. Buckley nor AIG provided any explanation as to this discrepancy.  AIG also failed to explain why it chose to disregard Ms. Buckley's report that Plaintiff was able to perform her regular job in awarding benefits up to December 29, 2005, but then rely on her report in finding that Plaintiff did not meet the definition of total disability after December 29, 2005.

The Plan also points to the fact that Plaintiff began working part time in 2005 as a basis to justify its decision that she was not disabled after December 29, 2005.  However, she earned less than $3000 that year.  Further, she never earned more than $12,000 during her work from 2005-2008, clearly indicating that Plaintiff was only working part time.  The fact that Plaintiff was able to work part time does not support an inference or finding that Plaintiff is able to perform "any gainful job" full time.  This determination could not be made without a proper evaluation of Plaintiff's impairments as a whole and how they impacted her ability to work.

Based upon the foregoing, I find that the Plan, through AIG, did not make adequate findings as to the impact of Plaintiff's impairments, considered in combination, on her ability to work as ordered in the Order of Remand.  Accordingly, I find that its decision that Plaintiff does not meet the definition of total disability after December 29,

2005 is not supported by substantial evidence.  Since further fact finding is necessary, this case must once again be remanded.  *DeGrado v. Jefferson Pilot Fin. Ins. Co.*, 451 F.3d 1161, 116 (10th Cir. 2006) ("if the plan administrator 'fail[ed] to make adequate findings or to explain adequately the grounds of [its] decision,' the proper remedy 'is to remand the case to the administrator for further findings or explanation'") (quotation omitted).

I also find that the Plan erred by not determining whether Plaintiff met the definition of partial disability, *i.e.*, whether if Plaintiff was unable to perform the material duties of her prior job at El Pueblo, she can perform "at least one of these 'duties on a part-time basis" or "at least  one, but not all, of these duties on a full-time basis." (EPR0515.)  While the Plan argues that Plaintiff did not raise this issue in the lawsuit, it relied on the fact that Plaintiff was working part time to deny her benefits.  Further, the Plan was aware of Dr. Ramos' opinion that Plaintiff could only work up to 25 hours a week.  These facts should have put the Plan on notice that, if Plaintiff was not totally disabled, she might meet the definition of partially disabled.  Plan administrators "cannot shut their eyes to readily available information" in the record.  *Gaither v. Aetna life Ins. Co.*, 388 F.3d 759, 773 (10th Cir. 2004).  Accordingly, this issue must also be addressed on remand.

D.    Attorney Fees

In addition to an award of benefits, Plaintiff asks for an award of her attorney fees and costs from both the current action and the previous action pursuant to 29 U.S.C. § 1132(g).  Plaintiff asserts that she originally planned to come back to the court and seek an award of attorney fees if the Plan approved her benefit claim on remand, which it did.

However, after the court granted Plaintiff's first claim for relief and remanded the case

for further administrative review, the United States Supreme Court held that attorney fee

awards under 29 U.S.C. § 1132(g)(1) of ERISA are not limited to a "prevailing party",

but may be appropriate if the claimant shows "some degree of success." *Hardt v.*

*Reliance Standard Life Ins. Co.*, 560 U.S. 242, 130 S.Ct. 2149, 2157 (2010); *see also*

*Cardoza v. United of Omaha Life Ins. Co.*, 708 F.3d 1196, 1207 (10th Cir. 2013).[12]

In *Hardt*, the Supreme Court found that the district court properly exercised its

discretion in awarding attorney fees to the plaintiff where she:

> persuaded the District Court to find that "the plan administrator has failed to
> comply with the ERISA guidelines" and "that Ms. Hardt did not get the kind
> of review to which she was entitled under applicable law." . . . Although Hardt
> failed to win summary judgment on her benefits claim, the District Court
> nevertheless found "compelling evidence that Ms. Hardt is totally disabled
> due to her neuropathy," and stated that it was "inclined to rule in Ms. Hardt's
> favor" on her benefits claim, but declined to do so before "first giving Reliance
> the chance to address the deficiencies in its" statutorily mandated "full and
> fair review" of that claim.

130 S. Ct. at 2158.  After Reliance conducted that review, "and consistent with the

District Court's appraisal, Reliance reversed its decision and awarded Hardt the benefits

she sought." *Id.*  The Supreme Court found that "[t]hese facts establish that Hardt has

achieved far more than 'trivial success on the merits' or a 'purely procedural victory'"

and, accordingly, "she has achieved 'some success on the merits'". *Id.*

Based on *Hardt*, Plaintiff asserts that she is entitled to her attorney fees from the

first action.  She asserts that fees are appropriate both because her benefit claim was

actually approved, at least partially, on remand, and also based on successfully

---

[12]  29 U.S.C. § 1132(g)(1) states that "the court in its discretion may allow a reasonable attorney's
fee and costs of action to either party."

obtaining the remand order itself.  Plaintiff further asserts that she is entitled to her

attorney fees for the post-remand administrative process and this court action.

I first deny without prejudice Plaintiff's request for attorneys' fees in connection

with this case.  The Supreme Court in *Hardt* declined to decide "whether a remand

order, without more, constitutes 'some success on the merits' sufficient to make a party

eligible for attorney's fees under § 1132(g)(1)."  130 S. Ct. at 2158.  If Plaintiff achieves

success on remand, she may renew her request for attorney fees at that time.

However, I find that Plaintiff should be awarded reasonable attorney fees in

connection with the first action, Case No. 06-cv-01343.  First, Plaintiff has shown

success on the merits.  *See Tomlinson v. El Paso Corp.*, No. 04-cv-02686-WDM-MEH,

2011 WL 1158637, *2 (D. Colo. March 30, 2011) (noting that *Hardt* requires the court to

make a threshold determination that a party is eligible for an award of attorneys' fees by

deciding whether that party has shown some degree of success on the merits).  Plaintiff

obtained a remand based on numerous errors by the Plan, and she was ultimately

success as to her claim for benefits in that case.

Second, I find that the five factors the court may consider in deciding whether an

award of attorneys' fees is appropriate also weigh in favor of such an award.[13]  These

factors are "1) the degree of the opposing party's culpability or bad faith; (2) the

opposing party's ability to satisfy an award of fees; (3) whether an award of fees would

deter others from acting under similar circumstances; (4) whether the party requesting

---

[13]   While *Hardt* left open the question as to what factors should be considered in resolving that issue, the Tenth Circuit has since held that the court can consider the five factors normally analyzed in determining whether an award of fees is appropriate.  *Cardoza*, 708 F.3d at 1207.

fees sought to benefit all participants and beneficiaries of an ERISA plan or to resolve a significant legal question regarding ERISA; and (5) the relative merits of the parties' positions." *Cardoza*, 708 F.3d at 1207 (citing *Gordon v. U.S. Steel Corp.,* 724 F.2d 106, 109 (10th Cir.1983)). "No single factor is dispositive and a court need not consider every factor in every case." *Id.*

Here, while the first and fourth factors weigh in favor of Defendant, I find that the other three factors weigh in favor of Plaintiff and an award of fees. First, the Plan does not contest its ability to satisfy an award of attorney fees. Second, I find the Plan's argument weak on the merits. Finally and most importantly, I find that an award of fees may serve as a deterrent to others similarly situated. While the Plan asserts that AIG scrupulously complied with the Order of Remand, I found to the contrary in this Order. Indeed, it does not appear that AIG even provided a copy of the Order of Remand, or a summary of same, to its experts. If it had done so, error may have been avoided. Thus, I am required to remand this case yet again due to noncompliance with a previous Order of Remand. This should serve as a warning to others similarly situated that plan administrators must scrupulously comply with orders of remand and the fact finding such orders require.

Accordingly, I find that an award of reasonable attorney fees to Plaintiff in connection with her previous action is appropriate. Plaintiff shall submit documentation in support of the attorney fees it requests within thirty (30) days. Defendant shall file a response as to the reasonableness of the fees sought within twenty (20) days of service of Plaintiff's documentation. Plaintiff may file a reply within fifteen (15) days of service of the response.

IV.    <u>CONCLUSION</u>

Based upon the foregoing, I find that this case must be remanded to the Plan

administrator for further fact finding consistent with this Order.  I also find that Plaintiff

should be awarded reasonable attorney's fees in connection with her previous lawsuit. It

is therefore

ORDERED that this case is **REMANDED** to the Plan Administrator for further

factfinding on Plaintiff's disability opinion in accordance with this Order.  This case shall

be **TERMINATED**, but may be reopened upon motion if either party wishes to obtain

court review of the Plan's determination on remand.   It is

FURTHER ORDERED that Plaintiff shall be awarded reasonable attorney fees in

connection with her previous action, Civil Action No. 06-cv-01343, in an amount to be

determined by the Court after further briefing.  Finally, it is

ORDERED that Plaintiff shall submit documentation in support of the attorney

fees she requests within thirty (30) days.  Defendant shall file a response within twenty

(20) days of service of Plaintiff's documentation.  Plaintiff may file a reply within fifteen

(15) days of service of the response.

Dated:  September 5, 2013

BY THE COURT:


s/ Wiley Y. Daniel
Wiley Y. Daniel
Senior United States District Judge